## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| NICHOLAS MAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:19CV2329 JCH |
| | ) | |
| SPECIAL ADMINISTRATIVE BOARD OF | ) | |
| THE SCHOOL DISTRICT OF THE CITY | ) | |
| OF SAINT LOUIS, et al.,[1] | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment, filed

April 12, 2021.  (ECF No. 53).  The motion is fully briefed and ready for disposition.

## BACKGROUND

Plaintiff Nicholas May, a Caucasian male, began working for the St. Louis Public School

District in 2001 as a glass worker, or glazier.   (FAC, ¶ 21; Defendants' Statement of

Uncontroverted Material Facts for their Motion for Summary Judgment ("Defendants' Facts"), ¶

---

[1] In his First Amended Complaint (at times referred to as "FAC"), Plaintiff names as Defendants the Special Administrative Board of the School District of the City of Saint Louis, a.k.a. Special Administrative Board of the Transitional School District of the City of Saint Louis, and Saint Louis Public Schools, a.k.a. Saint Louis Public School District.  According to Defendants, at the time of his termination Plaintiff was employed by the Transitional School District of the City of St. Louis, which was governed by the Special Administrative Board of the Transitional School District of the City of St. Louis (the "SAB").  (*See* Defendants' Memorandum in Support of their Motion for Summary Judgment ("Defendants' Memo in Support"), P. 1 n. 1).  On July 1, 2019, the SAB's governing authority reverted back to the Board of Education of the City of St. Louis Public School District ("BOE"), and the official name of Plaintiff's former employer reverted back to the City of St. Louis Public School District.  (*Id.*).  Defendants maintain that although Plaintiff identifies the District and its governing Board as separate Defendants, the naming of the District is redundant and duplicative, as the BOE is the proper Defendant entity.  (*Id.*).  For ease of reference, the Defendants in this matter shall be referred to collectively as the "District" or "Defendant."

1).  In 2003, Plaintiff's position was outsourced, but he continued to work for the District as an employee of a third party contractor.  (Defendants' Facts, ¶ 2).  In July, 2011, Plaintiff's position was reinstated, and he began working directly for the District as a District employee.  (*Id.*, ¶ 3).

In July, 2015, the District's Maintenance Department issued a Uniform Procedure Memorandum outlining its expectations for maintenance employees.  (Defendants' Facts, ¶ 4). The District required that its maintenance workers who travel among the various school buildings wear a uniform, so that they were easily identifiable as District employees as opposed to unauthorized individuals.[2]  (*Id.*, ¶ 6).  On August 11, 2015, Plaintiff signed a document acknowledging that he had received a copy of the Facility Operations Procedures, which included, among other items, the Uniform Procedure.  (*See Id.*, ¶ 7 and Plaintiff's Response thereto).  In 2016, the District's Maintenance Department issued another memorandum, which also included a paragraph expressing the Department's expectation that maintenance employees wear the designated uniform.  (*Id.*, ¶ 8).  Plaintiff signed an acknowledgement of the memorandum on July 25, 2016, stating that he had read and understood the expectations listed above, and that his failure to follow those expectations would result in appropriate disciplinary action up to and including termination.  (*Id.*, ¶ 9).

On several occasions in 2016, Plaintiff failed to abide by the Maintenance Department's uniform policy.  (Defendants' Facts, ¶ 12).  For example, on October 27, 2016, Defendant issued Plaintiff a verbal warning, documented in an SLPS Accountability Meeting Report, which stated in relevant part as follows:

> On Oct 27, 2016, Nicolas May reported to work wearing jean pants and not his District provided uniform pants as required.  When asked why he wasn't wearing his District provided pants, his statement to me was, "they

---

[2] The District has approximately 70 schools and 4,000 employees.  (Defendants' Facts, ¶ 5).

are uncomfortable."[3]

> On several different occasions, Mr. May was instructed that he must wear the uniform pants that were issued to him by the District. Failure not to wear the District provided pants as directed is unacceptable and will not be tolerated.

(*See* Defendants' Exh. F, P. 10). The report informed Plaintiff that the notice contained therein was provided in order to correct conduct, and that if the conduct was repeated or Plaintiff engaged in any other undesirable conduct, he would be subject to disciplinary action, up to and including termination. (*Id.*).[4] Five weeks later, on December 8, 2016, Plaintiff again wore jean bottoms to work in lieu of his District-issued uniform pants. (*Id.*, P. 3; Defendants' Exh. G). Plaintiff responded to this and other allegations of misconduct on December 12, 2016, stating in relevant part as follows:

> The unprofessional manner that is described in allegations above are false except for the fact that I reported to work wearing a pair of blue jeans that are the same color (same shade of navy/dark blue) as the Aramark pants that are issue[d] under a uniform contract. I was wearing my Aramark supplied, SLPS shirt…I was respectful and professional in my manner when I told R.J.[5] that I needed a larger size pant, since I had gained weight and the ones that I had been trying to wear no longer fit….I don't know why I would have thought such tension might be created by the situation because (1) other tradepeople wear alternate pants everyday, i.e., painters, plasterers, electricians and various other[s] that occasionally don't have their SLPS pants on, (2) I told Rosmon that I was trying to wear the "too small pants [but they] were unzipping themselves some without the bottom being used (this made them somewhat bearable but was a problem with the zipper), (3) I've expressed to Rosmon in the past, the amount of additional discomfort the pants were giving me due [to] a skin condition that I have. Their (sic) exists other reasons why the pants are a

---

[3] Plaintiff handwrote the following comment here: "[unintelligible] that I would be wearing a harness." (Defendants' Exh. F, P. 10).

[4] Five months earlier, Plaintiff had received a verbal warning for insubordination, following an incident in which he allegedly became belligerent during a tradesman meeting when the issue of the uniform requirement arose. (*See* Defendants' Exh. F, P. 5).

[5] Rosmon Johnson ("Johnson") was the District's Maintenance Manager, and supervisor to Wilton Cheatham ("Cheatham"), Plaintiff's immediate supervisor. (Defendants' Facts, ¶¶ 28, 29).

problem…I have voiced those in the past, but in this particular case I am not fitting in the pants.

(Defendants' Exh. F, PP. 3, 11-13).

During this same general time frame, Plaintiff allegedly engaged in other misconduct and policy violations.  (Defendants' Facts, ¶ 15).  For example, in July, 2016, Plaintiff was involved in an incident/altercation with Cheatham.  (*Id.*, ¶ 16).   Following an investigation Edmond Heatley, Chief Human Resources Officer for the District, issued Plaintiff a Letter of Reprimand, Final Warning and Mandatory Employee Assistance Program (EAP), stating in relevant part as follows:

> The Human Resources Division received an allegation that you acted in an inappropriate, and unprofessional manner when [you] became involved in a verbal and physical altercation with a supervisor.
>
> It was further alleged that you were dismissive of Mr. Cheatham when he was addressing you, you moved aggressively towards him and used profane language in front of other co-workers yelling, "You pushed me mother fucker!  You prick son of a bitch."  Your behavior was unprofessional and comments were inappropriate [and] offensive."…
>
> Based on the subsequent investigation, the District has determined that your unprofessional and aggressive conduct initiated a defensive response. Moreover, you used profane language, your demeanor was unprofessional and insubordinate.  And finally, that you blatantly refused a clear directive from your supervisor.  This conduct was a direct violation [of] SAB Policies….
>
> Be advised that your conduct has [been] deemed egregious enough to warrant suspension.  However, the District has chosen not to suspend you at this time.  This letter serves as a Formal Letter of Reprimand and Final Warning.  Additionally, you are directed to….make an appointment with a counselor to discuss anger management strategies.  You are hereby directed to attend 3 sessions to discuss anger management strategies.
>
> Be advised that future acts of policy violations may result in further disciplinary action up to and including termination of your employment.

(Defendants' Exh. F, PP. 7-8).[6]  While Defendant asserts Plaintiff refused to follow the District directive to attend EAP anger management sessions, Plaintiff counters that he contacted at least one person at the EAP program and discussed the incident with them.  (Defendants' Facts, ¶ 17 and Plaintiff's Response thereto).   Plaintiff admits, however, that although he scheduled an appointment with a social worker at EAP, he failed to show up for the appointment.  (*Id.*).

Based on the foregoing, Plaintiff was issued a formal Statement of Charges ("SOC") and Notice of Hearing by the District on March 22, 2017, seeking a 30-day suspension without pay. (Defendants' Exh. F, PP. 1-4).  An evidentiary administrative hearing was held before a three-person Personnel Committee on April 3, 2017.  (Defendants' Facts, ¶ 19; Defendants' Exh. I, P. 31).  Plaintiff was represented by counsel at the hearing, and was permitted to call and cross examine witnesses.  (Defendants' Facts, ¶ 20).  The Personnel Committee issued its Findings of Fact, Conclusions of Law and Decision on April 18, 2017, in which it unanimously found that Plaintiff had violated District Policies 4840(8) and 4840(15), as charged in the March 22, 2017, SOC.  (Defendants' Exh. I,  PP. 31-42).  The Committee ordered that Plaintiff be suspended without pay for thirty calendar days.  (*Id.*, P. 41).  Although Plaintiff had the right to appeal this decision to the Circuit Court by way of a Petition for Review, he did not do so.  (Defendants' Facts, ¶ 22).

Plaintiff served his 30-day suspension and returned to his job duties on April 24, 2017. (Defendants' Facts, ¶ 23).  According to Defendant, Plaintiff's misconduct persisted upon his return.  (*Id.*, ¶ 24).  For example, Johnson testified that in May 2017, Plaintiff was seen putting

---

[6] Plaintiff signed the letter of reprimand, acknowledging receipt, "under duress."  (Defendants' Exh. F, P. 8).  He denies that his behavior was unprofessional, maintaining instead that Cheatham physically assaulted Plaintiff.  (*See* Plaintiff's Responses, Exceptions, and Objections to Defendants' Statement of Uncontroverted Facts for their Motion for Summary Judgment ("Plaintiff's Response to Defendants' Facts"), ¶ 16).

tools from his personal vehicle into the District van.  (Defendants' Exh. A, PP. 5-6).  While it initially was unclear whether Plaintiff had taken District tools home or was using his personal tools for District work (neither of which was permitted), Johnson stated he eventually learned the tools were Plaintiff's personal tools, and he was using them because he did not have all the tools he needed.  (Defendants' Facts, ¶¶ 26, 27).  Johnson therefore directed Cheatham to conduct an inventory of Plaintiff's tools, to determine what additional District tools he may need.  (*Id.*, ¶ 28).  Cheatham testified that he attempted to get the information from Plaintiff, but that Plaintiff became confrontational and never produced such with respect to his tools.  (Defendants' Exh. J, PP. 4-5).[7]  Cheatham reported the interaction to Johnson, and Johnson sent a text to Plaintiff requesting to meet.  (Defendants' Facts, ¶¶ 32, 33).  The provided portion of the text conversation between Plaintiff and Johnson reads as follows:

> Plaintiff:    I'm taking my lunch now.
> Johnson:   Do not leave.
> Plaintiff:    Going to lunch.
> Johnson:   This is not an option, I (sic) giving you a direct order. I need to see you now.
> Plaintiff:    What is your agenda?
> I have gotten sick. My nerves are shaken by all the threats.
> I will be out the rest of the day.

(Defendants' Exh. K, P. 2).  Plaintiff then left the premises and did not return that day. (Defendants' Facts, ¶ 35).

Also in May, 2017, Plaintiff made a statement to the effect that, "maybe if I feed them a bunch of bullshit, they'll make me a supervisor too."  (Defendants' Facts, ¶ 36, quoting Defendants' Exh. L, P. 114).  Tim Hauk ("Hauk"), a supervisor, believed the statement was

---

[7] Plaintiff asserts that the interaction referred to in Cheatham's testimony actually involved the production of a "tool list," which was to be completed by Plaintiff, as well as a "tool inventory," which was to be completed by Cheatham.  (Plaintiff's Response to Defendants' Facts, ¶ 31). Plaintiff maintains he indicated to Cheatham that he was in the process of producing the tool list, and that he eventually produced a detailed list of over fifty items.  (*Id.*).

directed to him because he was the only supervisor present at the time.  (*Id.*).[8]  Hauk reported the statement to Johnson, and as a result John Zaegel ("Zaegel"), Director of Facilities for the District and Johnson's supervisor, met with Plaintiff.  (*Id.*, ¶¶ 38, 39).  Following the meeting, Zaegel sent an email to Johnson and David Glenn, Human Resources Investigator for the District, stating as follows:

> Today at approximately 10:30 we talked with Mr. May to ask if he had indeed said what had been reported to us at the time clock last night.  He spent about 3-4 minutes talking about how he couldn't believe we were asking him about it and that he says a lot of things over the course of a day while kidding with his co-workers and asked us to repeat what we had heard 3-4 more times.  I told him we just needed to know if he had said it or not and his response was "I don't remember if I said it or not".  At that time we told him he could go back to work.  Instead of leaving he began to lecture us on how he could not believe we had called him in to ask this question.

> What concerns me the most was during this lecture he made the statement "What is this, Nazi Germany.  First Rosmon perjures himself on the stand at my hearing, now you have spies listening in on my conversations.  Don't you guys have anything better to do than ask me these questions."  At this point I stopped him and said "you just made a very serious accusation about Rosmon."  To which he went on to talk about how Rosmon and others had lied about him and what had happened back at the beginning of the school year.  I again stopped him and said we just needed to know the answer to the question that we had asked.  And reminded him that he could leave to go back to work.  This went on a little while longer before he finally left.

> I feel Mr. Mays (sic) attitude and excitable nature are a detriment to the team and quite frankly a safety threat, in that he cannot control his escalations of a simple yes or no question into something blown way out of proportion.  He is very cavalier about throwing around serious accusations in a very boisterous manner and does not seem to be able to have a civil conversation with his managers.

(Defendants' Exh. M).  According to Defendant, as a result of Plaintiff's comments to Hauk and

---

[8] Plaintiff denies that the statement was directed toward Hauk, but conceded in his testimony that he must have said those words or something similar.  (Plaintiff's Response to Defendants' Facts, ¶¶ 36, 37; Defendants' Exh. L, P. 227).

Zaegel, the District's Human Resources Department set up a meeting with Plaintiff. (Defendants' Facts, 43).  Someone from Human Resources asked Johnson to deliver a letter to Plaintiff, providing him with notice of the meeting.  (*Id.*).  Johnson testified that he went to Fanning Middle School to deliver the letter, but Plaintiff responded by again accusing Johnson in a loud voice of lying about the prior incident.  (Defendants' Exh. L, P. 24).  Johnson asked Plaintiff to come outside to discuss the matter in private, because staff remained in the school building, but Plaintiff refused.  (*Id.*).[9]  Plaintiff met with the Human Resources staff on May 23, 2017, regarding these latest incidents, and was given an opportunity to write a written response to the allegations against him.  (Defendants' Facts, ¶ 47).  Plaintiff wrote "None is true" in large letters across the face of the allegations regarding the tool list/inventory.  (Defendants' Exh. K, P. 3).[10]  He subsequently left the District's Human Resources Department before the meeting process was complete, even though Charles Burton, the District's Chief Human Resources Officer, informed Plaintiff that he needed to complete the meeting and that leaving before doing so would be considered insubordination.  (Defendants' Facts, ¶ 49).[11]  Finally, Cheatham documented an alleged incident during a planning meeting between Plaintiff, Cheatham, and William Sumner, in which Plaintiff allegedly became increasingly agitated and said to Cheatham, "Just make a fucking decision, I don't have time to talk about this."  (*Id.*, ¶ 50; Defendants' Exh. N).  Cheatham went on to state as follows:

> Mr. May has exhibited this agitated and belligerent behavior on numerous documented occasions.  His behavior is disruptive and threatening to the other employees in the area.  Mr. May's behavior makes others feel

---

[9] Plaintiff maintains he remained inside because he did not want to be alone with Johnson. (Plaintiff's Response to Defendants' Facts, ¶ 45).

[10] Plaintiff states that he later provided a four page response to the allegations.  (Plaintiff's Response to Defendants' Facts, ¶ 48).

[11] While Plaintiff admits that Burton made the above remarks, he denies that the meeting process was incomplete.  (Plaintiff's Response to Defendants' Facts, ¶ 49).

uncomfortable and unsure whether he will become more hostile and dangerous.

(*Id.*).[12]

As a result of the above and additional actions, Plaintiff was issued a second Statement of Charges and Notice of Hearing on July 27, 2017, this time seeking his termination. (Defendants' Facts, ¶ 51). He again was provided with an evidentiary administrative hearing in front of a three-person Personnel Committee, and as with the previous hearing, Plaintiff was represented by counsel and allowed to call and cross examine witnesses. (*Id.*, ¶¶ 52, 53). The Committee issued its Findings of Fact, Conclusions of Law and Decision on November 21, 2017, in which it unanimously found that Plaintiff had violated numerous District Policies, as charged in the July 27, 2017, SOC, and that Plaintiff's conduct constituted terminable offenses. (Defendants' Exh. O). Plaintiff therefore was ordered discharged from his permanent employment with the District as of the date of the opinion. (*Id.*, P. 14).

On December 21, 2017, Plaintiff filed a Petition for Administrative Review in the Circuit Court of the City of St. Louis, challenging the legal basis for his termination. (Defendants' Exh. P). On December 11, 2019, the Circuit Court issued its Findings of Fact, Conclusions of Law, and Judgment, in which it held in part as follows:

> 7.    Pursuant to Section 168.281 RSMo, a permanent employee of the school district may be removed or suspended from his position for violating the published regulations of the District….
>
> 9.    Based on the record as a whole, there is substantial and competent evidence to support the Committee's conclusion that Petitioner violated district policies and regulations and Missouri statutes.
>
> 10.   The decision of the Personnel Committee to terminate Petitioner's employment was not arbitrary, capricious, unreasonable, or an

---

[12] Plaintiff testified that he did not recall making the statement, but acknowledged that he was "frustrated" that day. (Defendants' Exh. L, PP. 286-87).

abuse of discretion….

THEREFORE, it is Ordered and Decreed that the Personnel Committee of the Special Administrative Board of the School District of the City of St. Louis' November 21, 2017 Administrative Decision terminating Petitioner's employment is hereby AFFIRMED.

(Defendants' Exh. Q, PP. 10-11).

On May 16, 2018, Plaintiff filed his Charge of Discrimination with the Equal Employment Opportunity Commission, in which he alleged discrimination based on race and disability[13], and retaliation.   (ECF No. 1-1, PP. 22-24).   He filed his original Petition for Damages in the Circuit Court of the City of St. Louis on June 12, 2019.  (ECF No. 1-1, PP. 2-18).   Defendant removed the Petition to this Court on August 9, 2019, on the basis of federal question jurisdiction.  (ECF No. 1).  In his First Amended Complaint, filed September 18, 2019, Plaintiff asserts the following claims:   (1) Failure to Accommodate, in violation of the Americans with Disabilities Act of 1990, as amended ("ADA") (Count I); Disability Discrimination, in violation of the ADA (Count II); Disability Discrimination:  Hostile Work Environment, in violation of the ADA (Count III); Race Discrimination:   Hostile Work Environment, in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII") (Count IV); Race Discrimination:  Tangible Employment Action, in violation of Title VII (Count V); and Retaliation, in violation of the ADA (Count VI).  (ECF No. 16).

As stated above, Defendant filed the instant Motion for Summary Judgment on April 12, 2021, claiming there exist no genuine issues of material fact and Defendant is entitled to judgment as a matter of law.  (ECF No. 53).

## SUMMARY JUDGMENT STANDARD

---

[13] Plaintiff's alleged disability is tinea versicolor, a skin condition.  (Defendants' Facts, ¶ 61).

The Court may grant a motion for summary judgment if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The substantive law determines which facts are critical and which are irrelevant.  Only disputes over facts that might affect the outcome will properly preclude summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id*.

A moving party always bears the burden of informing the Court of the basis of its motion. *Celotex*, 477 U.S. at 323.  Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute."  Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 247.  The nonmoving party may not rest upon mere allegations or denials of its pleadings.  *Anderson*, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. *Anderson*, 477 U.S. at 255.  The Court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial.  *Id*. at 249.

## DISCUSSION

## I.   Disability Discrimination (Counts I, II)

When analyzing a claim of disability discrimination under the ADA, the Court applies the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  Under this framework, Plaintiff first must establish a prima facie case of discrimination by demonstrating "(1) that the plaintiff was disabled within the

meaning of the ADA; (2) that the plaintiff was qualified to perform the essential functions of the job [with or without a reasonable accommodation]; and (3) a causal connection between an adverse employment action and the disability."  *Lipp v. Cargill Meat Solutions Corp.*, 911 F.3d 537, 544 (8th Cir. 2018) (internal quotation marks and citation omitted).  *See also Gardea v. JBS USA, LLC*, 915 F.3d 537, 541 (8th Cir. 2019) (requiring plaintiff claiming failure to accommodate first to show that he has an ADA disability, that he suffered an adverse employment action, and that he is a qualified individual). If the plaintiff succeeds, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *Lipp*, 911 F.3d at 544.  If the employer is able to do so, "[t]he burden then returns to the plaintiff to show that the employer's proffered reason was a pretext for discrimination."  *Id.* (citation omitted).

### A.   <u>Whether Plaintiff Is Disabled</u>

In its Motion for Summary Judgment, Defendant first claims Plaintiff cannot satisfy the "disability" prong of the prima facie test.  The ADA defines "disability" with respect to an individual as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual, (B) a record of such an impairment, or (C) being regarded as having such an impairment."[14]  *See* 42 U.S.C. § 12102(1).  The ADA further defines "major life activities" as including, but not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A).

In the instant case, Plaintiff's alleged disability entails suffering from the skin condition tinea versicolor.  (Defendants' Facts, ¶ 61).  He was first diagnosed with this skin condition

---

[14] Plaintiff does not claim to be regarded as having a disability.

while in high school, and the purported symptoms of the condition include itching, inflammation, discomfort, odor, and a skin pigment discoloration.  (*Id.*, ¶¶ 67, 68).  Plaintiff testified that the symptoms are present all or nearly all of the time, and are exacerbated by heat, direct sunlight, tight fitting clothing (and/or non-cotton clothing that does not breathe), and stress.  (*Id.*, ¶¶ 69, 70 and Plaintiff's responses thereto).  Plaintiff asserts his skin condition affects the major life activities of working and being outside on a daily basis during summer months.  (*Id.*, ¶ 71).[15]

With respect to being outdoors, Plaintiff testified during his deposition that he began kayaking as a young adult, and still does so at least several times every year, staying on the river for up to six hours at a time.  (Defendants' Facts, ¶¶ 73-74).  He further acknowledged going to the park and for walks of up to an hour at a time.  (*Id.*, ¶¶ 77, 78).  With respect to working, Plaintiff testified that since high school he has held jobs pumping gas, washing cars, training horses, and as a summer camp counselor, which involved kayaking, going on bicycle trips, and teaching children how to ride horses.  (*Id.*, ¶ 79).  He further stated that during his employment with the District, he never missed time from work or was unable to complete a work project due to his skin condition.  (*Id.*, ¶ 80).  Finally, Plaintiff testified that when his skin condition is at a low level condition, he "kind of forget[s] about it" unless someone mentions it.  (*Id.*, ¶ 81).

Upon consideration of the foregoing, the Court finds that Plaintiff has established that he suffers from the physical impairment of tinea versicolor.  A physical impairment alone, however, "is not necessarily a disability as contemplated by the ADA."  *Goff v. Performance Contractors, Inc.*, Case No. 18-0529-WS-MU, 2020 WL 1794967, at *6 (S.D. Ala. Apr. 8, 2020) (internal

---

[15] In his responses to Defendants' interrogatories, Plaintiff claimed that the condition also affected the major life activities of sleeping and having relations with his partner.  (*See* Defendants' Exh. R, P. 5).  Plaintiff offers no evidence of this, however, and so the Court does not find that he establishes a genuine issue of material fact with respect to these alleged limitations.

quotation marks and citation omitted). *See also Morey v. Windsong Radiology Group, P.C.*, 794 Fed.Appx. 30, 32 (2d Cir. 2019) (internal quotation marks and citations omitted) ("[W]hile Congress expanded the definition of 'substantially limits' when it amended the ADA in 2008, the amendments did not render the term 'impairment' limitless. The amendments did not diminish the importance of distinguish[ing] between conditions that are impairments and physical, psychological, environmental, cultural and economic characteristics that are not impairments."). As noted above, Plaintiff testified that he has continued to participate in summertime activities since his diagnosis decades ago, and his employment history demonstrates that his skin condition has had no significant impact on his ability to work in a variety of jobs and weather conditions. The Court thus finds that even when viewed in the light most favorable to Plaintiff, the record does not show that Plaintiff's impairment substantially limits any of his major life activities. Plaintiff thus fails to demonstrate that he is actually disabled within the meaning of the ADA. *Goff*, 2020 WL 1794967, at *6.[16]

As to Plaintiff's claim that he has a record of having a disability, Plaintiff testified about having visited medical providers regarding his skin condition on only two occasions in the past ten years, on July 22, 2015, and April 8, 2020. (Defendants' Facts, ¶ 83).[17] During his 2015 consultation with a dermatologist, Plaintiff was prescribed a 15-day supply of Ketoconazole cream, which had an out-of-pocket cost of $10.00. (*Id.*, ¶¶ 86, 87). Although there were refills available to Plaintiff, he provides no evidence that he ever refilled the prescription. (*Id.*, ¶ 87).

---

[16] Plaintiff's failure to establish that he suffers from a disability under the ADA also defeats his Count III claim of hostile work environment based on disability. *See Sellers v. Deere & Co.*, 791 F.3d 938, 945 (8th Cir. 2015) (holding that in order to prevail on a hostile work environment claim, the plaintiff must present evidence that he is a member of the class of people protected by the statute).

[17] While Plaintiff testified that "it's possible that [he] got treatment from somebody else", he provides no evidence of any such treatment.

During his 2020 virtual visit with a nurse practitioner, Plaintiff was prescribed a 30-day supply of Ketoconazole shampoo, and Fluconazole tablets for two weeks, with respective costs of $16.40 and $9.31.  (*Id.*, ¶¶ 84, 88, 89).  Again, despite the availability of refills, Plaintiff provides no evidence that he acquired medication beyond the initial prescriptions.  (*Id.*, ¶ 89).

Under the ADA, an individual has a "record" of a disability if he "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities."  *See* 29 C.F.R. § 1630.2(k)(1).  As discussed *supra*, Plaintiff fails to establish that his skin condition has limited any major life activity.  Furthermore, the Court finds that Plaintiff's limited interaction with medical personnel and infrequent use of prescription medications fail to establish that he has a record of suffering from such an infirmity.  Plaintiff thus fails to demonstrate that he suffers from a disability, and therefore cannot establish a prima facie case of disability discrimination.

### B.      Legitimate, Nondiscriminatory Reasons And Pretext

Even assuming Plaintiff could establish that he has a disability within the meaning of the ADA, the Court finds he cannot establish a causal connection between the termination and his alleged disability.  As noted above, Defendant maintains it terminated Plaintiff's employment because Plaintiff allegedly engaged in numerous instances of misconduct and policy violations, including his noncompliance with uniform requirements, his involvement in an incident/altercation with his immediate supervisor in July, 2016, his failure to attend employer-mandated EAP management sessions regarding said incident, his impermissible use of personal tools for District work in May, 2017, and his inappropriate comments and excitable, accusatory nature.  With these allegations, the Court finds Defendant successfully articulates a legitimate, nondiscriminatory reason for the adverse employment action.  Plaintiff offers no evidence that

Defendant's proffered reason was a pretext for discrimination, and so Defendants' Motion for Summary Judgment on Plaintiff's disability discrimination claims in Counts I and II must be granted.

## II.    Race Discrimination (Count V)

In Count V of Plaintiff's First Amended Complaint, he asserts a claim for Race Discrimination: Tangible Employment Action.  Claims of Title VII race discrimination also are analyzed under the *McDonnell Douglas* burden-shifting framework.  Thus, Plaintiff first must establish a prima facie case of discrimination by demonstrating that he:  "'(1) is a member of a protected group; (2) was meeting the legitimate expectations of the employer; (3) suffered an adverse employment action; and (4) suffered under circumstances permitting an inference of discrimination.'"  *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 903 (8th Cir. 2015) (quoting *Davis v. Jefferson Hosp. Ass'n*, 685 F.3d 675, 681 (8th Cir. 2012)).  Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *Id.*  "If the employer meets this burden, the presumption of discrimination disappears, requiring the plaintiff to prove that the proffered justification is merely a pretext for discrimination."  *Id.* (internal quotation marks and citation omitted).

The Court assumes without deciding that Plaintiff has established a prima facie case of race discrimination.[18]  As noted above, Defendant here offered a legitimate, nondiscriminatory

---

[18] In fact, Defendant presents compelling evidence that with his conduct, Plaintiff was not meeting the legitimate expectations of his employer.  Furthermore, Plaintiff's evidence that he suffered the adverse employment action under circumstances permitting an inference of discrimination is weak, as he provides mainly his own opinion that Defendant's actions were based on race.  *See Shanklin v. Fitzgerald*, 397 F.3d 596, 603 (8th Cir. 2005) (citing *Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 945 (8th Cir. 1994) (affirming grant of summary judgment because nonmoving party's only evidence to rebut motion was unsubstantiated

reason for Plaintiff's discharge, namely, his alleged misconduct and policy violations.   The burden thus shifts back to Plaintiff to show that the proffered reason was mere pretext for discrimination.

A plaintiff may establish pretext, among other ways, by showing that an employer treated similarly-situated employees in a disparate manner.  *Lee v. Mallinckrodt Enterprises, LLC*, 456 F.Supp.3d 1089, 1095 (E.D. Mo. 2020).

> The similarly situated co-worker inquiry is a search for a substantially similar employee, not for a clone.  [Plaintiff] must prove only that the other employees were similarly situated in all relevant respects.

*Id.* (internal quotation marks and citations omitted).

In an effort to demonstrate pretext, Plaintiff points to two occasions when other employees, all African-American, allegedly were treated more favorably.  First, he references the July 5, 2016, "elevator incident," wherein Plaintiff claims that although he was physically pushed by his African-American supervisor, Cheatham, Plaintiff received a Formal Letter of Reprimand and Suspension Without Pay (and was directed to attend three anger management counseling sessions), while Cheatham was placed on administrative leave with pay, and then merely issued a Collegial Letter of Warning.  (Plaintiff's Statement of Additional Controverted Material Facts ("Plaintiff's Additional Facts"), ¶ 21).  Defendant counters that both Plaintiff and Cheatham were placed on administrative leave with pay pending investigation, and that it imposed the various disciplinary actions only after engaging in a full investigation, including obtaining witness statements.  (*See* Defendant's Response to Plaintiff's Additional Facts, ¶¶ 21,

---

statements in deposition)).  *See also Palesch v. Missouri Com'n on Human Rights*, 233 F.3d 560, 567-68 (8th Cir. 2000) ("[Plaintiff] offers little more than speculation and conjecture to make the required connection from the mistreatment she alleges to a gender or race-based animus. [Plaintiff] has failed to create a material issue of fact concerning whether she was subjected to workplace harassment because of either her race or gender.").

22). Next, Plaintiff claims that Gary Fowler and Greg Hartnett, both African-American, were permitted to wear work jeans instead of uniform pants. (Plaintiff's Additional Facts, ¶ 24).[19] Defendant counters that neither man was similarly situated to Plaintiff, as Hartnett had not yet obtained uniform pants from the uniform vendor, and Johnson was not aware of Fowler being out of uniform. (Defendant's Response to Plaintiff's Additional Facts, ¶ 24).[20] Finally, Defendant offers evidence that one of Plaintiff's co-workers, a Black employee named Eural Thomas, was disciplined in the same manner as Plaintiff for his uniform non-compliance and other misdeeds. (Defendants' Facts, ¶¶ 110-115). Plaintiff offers nothing else to support an inference that the termination decision was motivated by discriminatory animus, and so this portion of Defendants' Motion for Summary Judgment must be granted.

## III.   <u>Hostile Work Environment (Counts III, IV)</u>

In Count III of his First Amended Complaint, Plaintiff asserts a claim for Disability Discrimination: Hostile Work Environment. In Count IV, he asserts a claim for Race Discrimination: Hostile Work Environment.[21] "'[T]o establish a hostile work environment

---

[19] Plaintiff further alleges various electricians were permitted to wear non-uniform overalls/coveralls, and painters and plasterers were permitted to wear non-uniform white painters' pants and white t-shirts. (Plaintiff's Additional Facts, ¶ 24). He fails to rebut Defendant's response, however, that neither electricians, painters, nor plasterers were permitted to be out of compliance with the uniform policy, and that white pants and t-shirts were the uniform for painters and plasterers. (*See* Defendant's Response to Plaintiff's Additional Facts, ¶ 24).

[20] The Court further notes that Defendant provided reasons for Plaintiff's termination beyond the uniform violations, and Plaintiff offers no evidence that either Hartnett or Fowler engaged in similar conduct. *See Moody v. Vozel*, 771 F.3d 1093, 1097 (8th Cir. 2014) (internal citation omitted) ("Moody notes other AHTD employees, who were disciplined for sexual harassment and other offenses, were not terminated. Moody does not, however, engage in a full comparator analysis, nor does he seriously and persuasively dispute the defendants' evidence that these noted individuals were not similarly situated to him.").

[21] Plaintiff's race-based hostile work environment allegations are perplexing, as he claims, among other things, that he is a member of the class of persons protected by Title VII *by virtue of*

based on disability, plaintiff must show that (1) []he is a member of the class of people protected by the statute, (2) []he was subject to unwelcome harassment, (3) the harassment resulted from [his] membership in the protected class, and (4) the harassment was severe enough to affect the terms, conditions or privileges of [his] employment.'"   *Johnson v. Robert McDonald Secretary Department of Veterans Affair*, No. 4:15CV1869 CAS*, 2016 WL 5870061, at *5 (E.D. Mo. Oct. 7, 2016) (quoting *Sellers*, 791 F.3d at 945).  *See also Hales v. Casey's Marketing Co.*, 886 F.3d 730, 735 (8th Cir. 2018) (listing elements for Title VII hostile work environment claim).

As to the fourth element, "[i]n order to be actionable, harassment must be both subjectively hostile or abusive to the victim and 'severe and pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive.'"   *Shaver v. Independent Stave Co.*, 350 F.3d 716, 721 (8th Cir. 2003) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).  *See also Moses v. Dassault Falcon Jet-Wilmington Corp.*, 894 F.3d 911, 922 (8th Cir. 2018).   "Anti-discrimination laws do not establish codes of civility in the workplace and '[c]onduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of the law.'"   *Johnson*, 2016 WL 5870061, at *5 (citation omitted).  In order to determine whether the harassment affected a term, condition or privilege of employment, courts must "consider the totality of the circumstances, including the frequency and severity of the conduct, whether it is physically threatening or humiliating, and whether it unreasonably interferes with [Plaintiff's] job performance."  *Sellers*, 791 F.3d at 945 (internal quotation marks and citation omitted).

---

*his male gender*, and that various employees of "Defendant Police Department" subjected him to severe and unwelcome conduct.  (FAC, ¶¶ 85, 86).

"'The Supreme Court has cautioned courts to be alert for workplace behavior that does not rise to the level of actionable harassment.'" *Moses*, 894 F.3d at 922 (quoting *Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1038 (8th Cir. 2005)).

> The stringent hostile work environment standard is designed to filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language ... and occasional teasing. [M]erely rude or unpleasant conduct are insufficient to affect the terms and conditions of employment. The plaintiff must show that the alleged harassment was so intimidating, offensive, or hostile that it poisoned the work environment. [S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.

*Id.* at 922-23 (internal quotation marks and citations omitted).

Upon consideration, the Court finds that "the conduct about which [Plaintiff] complains is not severe enough to support his hostile work environment claim[s]." *Id.* at 922 (internal quotation marks and citation omitted). In other words, while the complained-of conduct can be characterized as rude or unpleasant, it was not severe or pervasive enough to affect the terms, conditions, or privileges of Plaintiff's employment. *Id.* at 923. *See also Jackman v. Fifth Judicial Dist. Dept. of Correctional Servs.*, 728 F.3d 800, 806 (8th Cir. 2013) (internal quotation marks and citations omitted) ("The standard for demonstrating a hostile work environment under Title VII is demanding, and does not prohibit all verbal or physical harassment and it is not a general civility code for the American workplace....On their face, [the] comments are best characterized as offensive, but not so severe or pervasive as to permeate the workplace."). This portion of Defendant's Motion for Summary Judgment will therefore be granted.

## IV.   Retaliation Under The ADA (Count VI)

In Count VI of his First Amended Complaint, Plaintiff alleges he was retaliated against as a result of his engagement in protected activities, namely reporting his disability to Defendant,

and requesting a reasonable accommodation for such.  The ADA prohibits retaliation against an employee, providing in relevant part that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter."  42 U.S.C. § 12203(a).  Pursuant to the *McDonnell Douglas* burden-shifting framework, the employee has the initial burden of establishing a prima facie case of retaliation, which he meets by showing that, "(1) [he] engaged in statutorily protected activity; (2) [he] suffered an adverse employment action; and (3) a causal connection between the two."  *Moses*, 894 F.3d at 924 (internal quotation marks and citations omitted). "To prevail on his retaliation claim, [Plaintiff] need not prove that he was disabled within the meaning of the ADA, but must demonstrate a good faith, reasonable belief that the underlying challenged actions of the employer violated the law."  *Hines v. Veterans Outreach Center*, No. 10-CV-6493, 2013 WL 12202521, at *8 (W.D. N.Y. Mar. 29, 2013) (internal quotation marks and citations omitted).  If an employee establishes a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for its action; if the employer does so, the burden then shifts back to the employee "to present evidence that (1) creates a question of fact as to whether [defendant's] reason was pretextual, and (2) creates a reasonable inference that [defendant] acted in retaliation."  *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 880 (8th Cir. 2005) (internal quotation marks and citations omitted).

The Court assumes without deciding that Plaintiff has established a prima face case of retaliation.[22]  As explained in section I(B), *supra*, Defendant maintains it terminated Plaintiff's

---

[22] Defendant again presents compelling evidence that Plaintiff cannot establish his prima facie case, as (a) Plaintiff fails to establish that he engaged in statutorily protected conduct in the first instance, and (b) the elapsed time between Plaintiff's purported protected activity and the July 25, 2017, SOC that eventually led to his termination over seven months later, belies any inference of a causal connection between the two events.  (*See* Defendants' Memo in Support,

employment because Plaintiff allegedly engaged in misconduct and committed policy violations. With these allegations, the Court finds Defendant successfully articulates a legitimate, nondiscriminatory reason for the adverse employment action.

The burden thus shifts back to Plaintiff to show that the proffered reason was mere pretext for retaliation.  Plaintiff offers no such evidence, however; instead, when questioned during his deposition as to why he believed that Johnson's actions constituted retaliation for Plaintiff's alleged protected activities, Plaintiff provided responses such as "I don't know" and "I don't know what he [Johnson] was thinking that day."  (Defendants' Facts, ¶ 116).  Plaintiff continued to speculate that Johnson may have engaged in the conduct because he "wanted to show power against [Plaintiff]", or to "back up his buddy [Cheatham] and keep him out of trouble."  (*Id.*, ¶ 117).  The Court finds Plaintiff's assertions insufficient to create a genuine question of material fact on the issue of pretext, and so Defendants' Motion for Summary Judgment on Plaintiff's disability retaliation claim must be granted.[23]

---

PP. 29-31, citing *Fercello v. Cty. of Ramsey*, 612 F.3d 1069, 1080 (8th Cir. 2010) (finding a 6-month gap between the protected activity and the adverse employment action weakens the inference of causation); *Muor v. U.S. Bank Nat. Ass'n*, 716 F.3d 1072, 1079 (8th Cir. 2013) (8-month gap "between the bulk of the alleged adverse actions and [the] protected activity vitiates [the] contention that the temporal link gives rise to an inference of retaliatory motive.")).

[23] In light of the above rulings, the Court need not address Defendant's contentions that Plaintiff's claims are precluded by the doctrines of res judicata and/or collateral estoppel, or that the majority of the claims are time-barred.

## <u>CONCLUSION</u>

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 53) is **GRANTED**, and Plaintiff's claims are **DISMISSED** with prejudice.   An appropriate Judgment will accompany this Memorandum and Order.


Dated this 30th Day of July, 2021.


/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE